IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 23, 2008 Session

## STATE OF TENNESSEE v. MARK ANTHONY FOULK

**Appeal from the Circuit Court for Sullivan County
No. S50, 580     R. Jerry Beck, Judge**

---

### No. E2007-00944-CCA-R3-CD - Filed January 8, 2009

---

The Defendant, Mark Anthony Foulk, was convicted by a jury of: one count of aggravated robbery, a Class B felony; one count of aggravated burglary, a Class C felony; one count of vandalism in the amount of $500 or less and one count of driving under the influence, both Class A misdemeanors; one count of speeding and one count of failure to obey a traffic control device, both Class C misdemeanors. He was sentenced to an effective term of eighteen years in the Department of Correction. In this direct appeal, the Defendant contends that (1) the evidence at trial was insufficient to establish his identity as the perpetrator of the vandalism, aggravated burglary, or aggravated robbery, and was otherwise insufficient to prove the elements of aggravated robbery; (2) the trial court erroneously instructed the jury on the elements of aggravated burglary; (3) he was effectively denied his right to a jury trial; (4) the court improperly instructed the jury that a certain State's witness, Detective Dale Quillen, was an expert on gunshot wounds and stippling; (5) the court improperly enhanced his sentences for aggravated burglary and aggravated robbery; and (6) the court improperly ordered consecutive sentences. We agree with the Defendant that the evidence at trial was insufficient to convict him of aggravated robbery, and accordingly modify this conviction to the lesser included offense of robbery. We also conclude that the trial court improperly enhanced the Defendant's sentences and failed to make the required findings to impose consecutive sentences. We conclude that the Defendant's other points of error lack merit. The case is remanded to the trial court for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;
Reversed in Part; Remanded for Resentencing**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. D. KELLY THOMAS, JR., J., filed a dissenting opinion.

Perry Stout, Johnson City, Tennessee, (at trial); and Kristi M. Davis, Knoxville, Tennessee, (on appeal, for the appellant, Mark Anthony Foulk.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Robert H. Montgomery, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The actions giving rise to this case began on the morning of March 29, 2005. At about 3:00 a.m., the eighty-three-year-old victim, Clara Rita Groseclose, woke up from sleeping in front of her television. The victim testified that, although her nephew sometimes stayed with her, she typically lived alone and was alone that morning. Her television room was on the ground floor of her house. The victim stood up, walked over to the television, and turned it off. She habitually kept with her a two-shot, two-barrel, pearl-handled Derringer pistol her father had given her for protection some years before. The victim picked up this pistol and started toward the stairs. One of the walls of the victim's house stood to her right as she approached the stairs; that wall formed the right wall of the staircase as well as the wall of the television room. The wall contained a window a few feet away from the entrance to the stairs. The house was completely dark except for the small amount of natural light coming through this window.

When the victim reached the fifth stair, she heard a noise "like the house caving in" coming from near the bottom of the stairs, which she later realized was made by the wood lattice in her window as it broke. She turned around to investigate, descending the stairs slowly. Nearing the bottom of the stairs, she saw "a shadow" coming into her house through the window, now a few feet in front of her and to her left. Realizing her danger, the victim readied her pistol. She had been told that, given the weapon's small .22 caliber ammunition, "it would take a lot of shots unless [she] hit a vital spot." She knew the pistol contained only two bullets, so she thought "well, shall I shoot him through the heart or through the head?" She first pointed the pistol at his chest but, thinking better of it, pointed it at his head. Her moment of indecision had cost her the opportunity to take a clear shot, however, as the person was "right on her" by that time. He successfully pushed the victim's arm to the side as she fired the first shot. He then grabbed her arm and pushed it down, pressing the victim's arm against her side. The gun went off a second time as the assailant pulled it out of the victim's hand; it is uncertain from the record whose finger actually pulled the trigger. The assailant, having secured the pistol, wrestled the victim to the ground.

He told her, "I just want some money. I'm on my way to Florida. They tell me you've got some money." She replied, "they've told you something I don't have." The assailant then said, "you've shot me. I'm bleeding." The victim was extremely frightened, and she assumed that he would strangle her or pistol-whip her now that she was unarmed. Instead, he asked the victim where her pocketbook was, and she told him to look for it in her purse, which was on a nearby magazine rack. He picked up the entire purse, which contained her billfold, her coin purse, and a key to her house.

At that moment the victim's security alarm sounded; the assailant fled out the window. Because of the darkness, the victim had not seen his face; at no point did she identify the Defendant as her assailant. The victim stood up, noting that the assailant had broken out the entire bottom frame of her window. She picked up her phone to call 911 but found that the line was dead. After walking outside to investigate, she found that her phone line, contained in a box on the outside wall immediately to the right of the broken window, had been cut.[1] Having no other option, she drove to the Kingsport Police Department to report the crime. At some point, she also noticed that her "aluminum six-foot" clothesline pole had been stolen, and on that basis testified to her belief that a second person must have helped her assailant carry it away. No second person ever entered her house, however.

At about 3:18 a.m., Deputy Micah Johnston of the Sullivan County Sheriff's Office was driving down Bloomingdale Road at a location a few hundred yards from the victim's home. He testified that he stopped for a red light at the intersection of Bloomingdale Road and Stone Drive, and he described the intersection with the assistance of photographs taken there. Bloomingdale Road is divided into two lanes at that point. As a sign on approach to the intersection indicates, the right lane allows cars either to proceed straight through the intersection or to turn right onto Stone Road; the left lane allows cars to proceed straight only. Additionally, a sign containing a "no left turn" graphic hangs between the two traffic lights controlling the intersection.

Deputy Johnston observed a white Chevrolet Lumina in the left, straight-only lane. When the traffic light turned green, the Lumina illegally turned left onto Stone Drive. Deputy Johnston followed it. The speed limit on that section of Stone Drive is forty-five miles per hour. Deputy Johnston, by matching the Lumina's speed and observing his own calibrated speedometer, determined that the Lumina was traveling about sixty miles per hour. Deputy Johnston also observed the Lumina swerving out of its lane. Deputy Johnston followed the car for a total of about one and a half miles. According to his log, he activated his blue lights at 3:21 a.m. The Lumina pulled into the parking lot of a nearby International House of Pancakes restaurant (IHOP).

Deputy Johnston approached the car and spoke to the driver, who he identified as the Defendant at trial. Deputy Johnston immediately noticed what he described as a "road rash type injury" on the Defendant's left cheek. He also noticed some cuts on the Defendant's hands. Deputy Johnston asked the Defendant about these injuries, and the Defendant replied that he had been in a fight in Kingsport.

At this point, Deputy Johnston noticed an odor of alcohol coming from the vehicle. He asked the Defendant to exit the vehicle in order to perform three field sobriety tasks to test his intoxication level: a nine-step walk-and-turn, a finger-to-nose task, and a one-legged stand. The Defendant confirmed that he had no physical impairments or limitations that would prevent him from completing these tasks. Deputy Johnston demonstrated each task for the Defendant and testified that the Defendant appeared to understand them.

---

[1]The victim testified that repairs to her window and phone line cost less than $500.

The Defendant failed, on every step of the walk-and-turn, to place his heel to his toe. He also missed three of the six required touches in the finger-to-nose task. Finally, he had difficulty maintaining his balance during the one-legged stand, and he had to touch the ground twice while counting from one to thirty. Based on these results, and on his general observations of the Defendant, Deputy Johnston formed the opinion that the Defendant was too impaired to legally operate a motor vehicle. On this basis, Deputy Johnston arrested the Defendant and placed him in the back seat of his cruiser. Officer Eric Alford had arrived at the scene in the meantime. He rolled the Lumina's windows up, locked its doors, and gave the Defendant's keys to Deputy Johnston. Deputy Johnston began driving the Defendant to the Sullivan County Jail.

The victim, meanwhile, had reached the Kingsport Police Department and reported the crime. Deputy Johnston heard on his police radio, as he was driving the Defendant, a report of that nearby home invasion. Deputy Johnston noticed that the Defendant turned his head and leaned forward when the report came over the radio. Deputy Johnston thought the Defendant was attempting to listen, although he admitted the possibility that the Defendant might simply have been passing out.

When he reached the jail, Deputy Johnston noticed some broken glass on the Defendant's jacket and "put two and two together." He called Kingsport, told them he had delivered a possible home invasion suspect to the jail, and gave them the location of the Defendant's secured vehicle. He then read Tennessee's implied consent law to the Defendant and informed him of the consequences of failing to take a blood alcohol test. In response to Deputy Johnston's request that the Defendant take the test and sign the implied consent form, the Defendant told him to "stick it up [his] ass." The Defendant's clothing and possessions were bagged, and he was placed in a cell.

David Quillen, at the time a detective with the Kingsport Police Department, was dispatched to the victim's house. Lieutenant Dale Phipps and Officer Seth Brunsfield were already on the scene when he arrived. First, Det. Quillen looked at and photographed the broken window from the outside. He saw that the victim's phone line had been cut. Although he agreed at trial that the tread on the Defendant's later-examined boot was substantial, he noticed no boot prints outside the window. He entered the house and noticed some glass on the floor under the window. He also noticed a lamp, a vase, and a handgun holster scattered on the floor "like there had been a struggle." Two apparent bullet holes were visible; one to the left of the broken window's frame, and another in the stairs. The hole in the stairs contained a bullet fragment. The hole in the window frame did not contain one, and a second bullet was never found.

In a few locations, he also saw a noticeable but relatively small amount of red substance, which he believed to be blood, including the carpet near the foot of the stairs, a nearby magazine rack, and a nearby iron table. After photographing the inside of the house and gathering the evidence, Det. Quillen returned to the Kingsport Police Department.

As he was processing the crime scene, Det. Quillen learned that Deputy Johnston had arrested the Defendant as a potential suspect. He also learned the location of the Defendant's car. Detective Quillen called Officer Daniel Horne and directed him to the Stone Drive IHOP to look for any plain

view evidence in the Defendant's vehicle. Officer Horne testified that, upon arrival at the IHOP, he looked into the car using his flashlight. While looking in across the hood from the passenger side, he saw a black leather bag, as well as the pearl handle of a pistol, partially visible under the driver's seat. Officer Horne recognized these as the items he had been told were reported missing in the recent home invasion. He notified Det. Quillen, who arranged to impound the vehicle. Officer Horne waited with the car until the tow truck arrived. The Defendant's car was taken to the Kingsport Police Department's rear parking lot.

Detective Quillen also sent Officer Amanda Sykes to the jail to inventory the Defendant's possessions. She testified that she observed and photographed in the Defendant's property bag one key ring with a number of keys on it, a second key ring with only one key on it, some change, a wallet, and some currency. The currency consisted of three five-dollar bills and four one-dollar bills. One of the five-dollar bills contained a tear repaired with clear tape. The second key ring had been found on the Defendant's person; the State established at trial that it contained the victim's house key. Officer Sykes also took pictures of the Defendant, which were introduced at trial. She also collected his clothing for investigation, including his boots, a camouflage jacket, and a blue shirt.

Detective Quillen went to the jail to see the Defendant, who declined to give a statement. Detective Quillen noticed that the Defendant had cuts on his hands. He also testified that he saw an abrasion on the left side of the Defendant's face and gave his opinion, based on his knowledge and experience as a detective, that the wound was "consistent with powder burns from the discharge of a gun." The Defendant was not tested for gunpowder stippling because he had already been allowed to wash his face.

After obtaining a search warrant, Det. Quillen searched the Defendant's vehicle. He found a blue steel Derringer and a black purse, both of which the victim identified at trial as those taken in the robbery. The purse contained the victim's identification as well as some personal items. Detective Quillen also found the Defendant's checkbook in the car.

The victim testified that two days later, on March 31, 2005, she noticed an injury on her right buttock. She originally assumed she was developing a boil, but on closer inspection, she discovered a powder burn. This prompted her to look at the underwear she had been wearing at the time she was robbed; she discovered a hole in them. She again drove to the Kingsport Police Department to document this wound and brought the underwear as well.

During the course of the resulting investigation, the following items were sent to the Tennessee Bureau of Investigation (TBI) for analysis: the victim's shirt, which she had apparently left with the police; the Defendant's boots, jacket, belt, pants, shirt, and sweater; the glass Deputy Johnston noticed on the Defendant's jacket, some glass found in his car, and glass from the victim's broken window; the victim's pistol; and the bullet and shell casings recovered during the investigation. Det. Quillen sent some of this evidence, and some was sent by his replacement, Det.

Jason Bellamy.[2]  After the TBI returned the evidence to Kingsport, Det. Bellamy acted as its custodian.  He brought the evidence to court and identified each piece of evidence at trial.

Three TBI forensic scientists combined to analyze these items and testified at trial.  Special Agent Teri Arney was qualified as an expert in firearms, tool marks, and gunshot residue.  She examined the victim's pistol and damaged underwear.  She testified that the bullet Det. Quillen recovered came from the bottom of the pistol's two barrels.  She also matched both recovered cartridge casings to the pistol.

Agent Arney also testified that the hole in the victim's underwear resulted from the high level of gas pressure produced by a gun's muzzle when the gun is fired.  The nature of the damage indicated to her that the gun was no more than an inch from the underwear when fired.  On cross-examination, Agent Arney noted, however, that one cannot tell from examining powder burns which particular weapon caused them.

Special Agent James Davis II was qualified as an expert in microanalysis with a specialty in trace evidence and analysis of glass and gunshot residue.  He examined the Defendant's coat for the presence of gunshot primer residue, which he testified will settle on anything located near a fired weapon.  He found particles on the jacket composed of barium and lead, a chemical composition consistent with the primer in Winchester ammunition, the type used in the victim's Derringer.  Agent Davis also compared glass from the crime scene with glass from the Defendant's jacket and car; the samples did not match.

Special Agent Mike Turbeville was qualified as an expert in serology and DNA analysis.  He testified that he first performed, on the relevant evidence, a test designed simply to detect the presence of human blood.  The victim's shirt and pistol, as well as the Defendant's shirt, sweater, pants, and right boot, came back positive.  The Defendant's belt and left boot came back negative.

Agent Turbeville then tested the blood on each positive item against DNA samples from the Defendant and the victim.  He confirmed, using DNA analysis, that the Defendant's right boot, sweater, and shirt contained only the Defendant's blood.  The victim's shirt contained only the victim's blood.  The Defendant's pants contained an amount of blood insufficient for DNA analysis.

The victim's pistol contained only enough blood for a partial profile, meaning that "there was some DNA there, just not a lot of it."  The available DNA was consistent with the Defendant's DNA, however, meaning that it did not rule out the Defendant, but it also was not a conclusive match. The State introduced Agent Turbeville's official serology and DNA report at trial.  The statistics test results contained therein indicate that the probability of an individual unrelated to the Defendant having a DNA profile consistent with the one found on the victim's pistol is approximately 1 in 258,900 among the African-American population, 1 in 33,110 among the Caucasian population, 1

---

[2]Detective Quillen stopped working for the Kingsport Police Department at some point during the course of the investigation.

in 27,480 among the Southeastern Hispanic population, and 1 in 35,240 among the Southwestern Hispanic population.

The Defendant did not testify or present other evidence at his trial. The jury found him guilty on all six counts of the indictment, fining him a total of $29,250. The Defendant was sentenced as a Range I, standard offender. The trial judge sentenced the Defendant to twelve years in the Department of Correction for his aggravated robbery conviction, to be served concurrently with sentences of eleven months and twenty-nine days each for his vandalism in the amount of $500 or less and driving under the influence convictions, as well as thirty days each for his speeding and failure to obey a traffic control device convictions. The trial judge sentenced the Defendant to six years in the Department of Correction for his aggravated burglary conviction, to be served consecutively to the terms above, for a total effective sentence of eighteen years. He now appeals.

**Analysis**

**I. Sufficiency of the Evidence**

The Defendant first challenges the sufficiency of the evidence used to convict him. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

**A. Evidence of the Defendant's Identity**

The Defendant contends that the State did not prove his identity as the victim's assailant beyond a reasonable doubt, and thus, that the evidence was insufficient to convict him of vandalism,

aggravated burglary, or aggravated robbery. In support of this argument, he asks us to note that Det. Quillen found no boot prints outside the victim's window, that no tools suitable for cutting a phone line were found on the Defendant or in his vehicle, and that the glass found on the Defendant's jacket and in his vehicle did not match the glass broken out of the victim's window. Finally, he asserts that he was too intoxicated to have done the acts the victim ascribed to her assailant. The victim was unable to identify her assailant.

Despite these facts, we conclude that the State presented evidence sufficient to support the Defendant's presence in the victim's home. Detective Quillen found the victim's purse and pistol in the Defendant's secured vehicle. Primer consistent with the ammunition used in the victim's pistol was found on the Defendant's jacket. The victim's pistol yielded a partial DNA sample consistent with the Defendant's DNA. The Defendant had one of the victim's keys on his person at the time he was arrested. Our supreme court has held that circumstantial evidence alone can establish a perpetrator's identity, so long as the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the [d]efendant and the [d]efendant alone." State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). We conclude that the evidence above is sufficient to do so here.

### B. Evidence of Aggravated Robbery

Tennessee Code Annotated section 39-13-401(a) defines robbery as "the intentional or knowing theft or property from the person of another by violence or putting the person in fear." An aggravated robbery is one "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a). The Defendant concedes, his identity as the victim's assailant being established, that the State presented evidence sufficient to convict him of robbery; even if the two had not physically struggled, the Defendant's presence in the victim's home would have put her in fear.

The Defendant contends that the State failed to present evidence sufficient to convict him of aggravated robbery, however, arguing that the robbery in this case was neither accomplished with the victim's pistol or other deadly weapon, nor by the display of that pistol or any article the victim might reasonably have believed to be a deadly weapon.[3] We analyze the legal significance of the Defendant's interactions with the victim and the victim's pistol in two stages: his actions during his disarmament of the victim, and his actions after he disarmed her.

### i. During Disarmament of Victim

Tennessee Code Annotated section 39-11-106(a)(5) defines a "deadly weapon" as either "[a] firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." The Defendant first exercised some amount of control over the victim's pistol, a deadly weapon, when he pushed her arm to the side, apparently sustaining a

---

[3]The State does not argue that the victim suffered serious bodily injury.

facial wound from her first shot. He wrestled her to the ground and pulled the pistol away from her hand, resulting in the discharge of the pistol's second and final shot. The Defendant did not in any way "display" the victim's pistol during this sequence.

We must therefore determine whether the Defendant's taking of the victim's pistol and subsequent taking of her purse were in some way "accomplished with" the measure of control he exercised over the victim's pistol during the struggle. The State argues that the Defendant's taking of the victim's pistol afforded him the opportunity to accomplish the robbery. We agree with the proposition that, but for his disarmament of the victim, the Defendant would have found it more difficult (in the case of the victim's purse), or impossible (in the case of the pistol itself), to complete the robbery. We are unable to conclude that the Defendant thereby "accomplished" the robbery with the pistol during this disarmament period, however. He did not disarm the victim for the purpose of effecting the robbery; he did so only in order to "accomplish" his goal of self-preservation. Although his actions were contemptible and dangerous, we think that under these facts the Defendant's culpability does not rise to the level of an aggravated robber.

### ii. After Victim Disarmed
The record contains no information regarding specifically what the Defendant did with the victim's pistol immediately after disarming her. We can infer from the short period of time the Defendant spent in the victim's house, as well as the pistol's subsequent presence in the Defendant's car, that he kept it on his person.

We must first determine whether the Defendant accomplished his robbery of the victim by displaying an actual or apparent deadly weapon. We conclude that he did not. The record contains no evidence that the Defendant ever "displayed" the victim's pistol after disarming her. The victim's television room was dark enough that she never saw her assailant's face; she also did not see her pistol after he took it from her. Although she understandably feared that the Defendant might pistol-whip her, the victim did not perceive the Defendant making any threatening gesture toward her with the pistol or otherwise.

Second, we examine whether the Defendant's robbery of the victim was "accomplished with" a deadly weapon during this post-disarmament stage. Having been fired twice, the pistol was unloaded when the Defendant obtained sole control over it. It is unclear whether the Defendant knew this; the victim did.

Tennessee law considers even an unloaded firearm to be a deadly weapon. See Tenn. Code Ann. § 39-11-106(a)(5)(A) (stating that any "firearm" is a deadly weapon) (referred to herein as "subsection A"); see also Turner v. State, 300 S.W.2d 920 (Tenn. 1957). In Turner, our Supreme Court agreed with the proposition that "whether a deadly weapon is capable of being shot is immaterial where the prosecution is for robbery with a deadly weapon," while noting as its underlying rationale the fact that "'the victim, or intended victim, of a robbery has no opportunity to examine a firearm to ascertain whether or not it is loaded' and 'has the right to assume that it is loaded and capable of producing death . . . .'" Id. at 920 (quoting Moore v. Commonwealth, 86

S.W.2d 145, 146 (Ky.App. 1935)). Turner thus contains some suggestion that the policy underlying Tennessee's "deadly weapon" definition might strip an unloaded firearm of its "deadly per se" status codified in subsection A, see State v. McGouey, 229 S.W.3d 668, 672 (Tenn. 2007), if a victim knows the firearm is unloaded, as did the victim in this case. We find it unnecessary to reach that question, however, and accordingly treat the Defendant as possessing a per se deadly weapon after his disarmament of the victim.

We therefore proceed having concluded that the victim's awareness that her pistol was unloaded does not change its status as a deadly weapon. Her awareness does, however, bear on whether the Defendant accomplished the robbery with it under these facts. Had the victim in this case believed her pistol, now in the Defendant's possession, to be loaded, we think she might reasonably have believed, even in the darkness of her living room, that the Defendant's request for money carried with it a threat to use the firearm if she failed to comply. The victim's knowledge that the pistol was unloaded foreclosed this possibility. In its absence, we are left with the fact that the Defendant did nothing perceptible with the pistol after disarming the victim. He did not point it at her or draw his arm back as if to threaten her; no evidence suggests that he did anything but hold the pistol in his hand or put it in one of his pockets. For these reasons, we are persuaded that the Defendant did not accomplish the robbery with the victim's pistol after he disarmed her.

For the reasons discussed above, we conclude that, under the facts and circumstances of this case, the Defendant neither accomplished the robbery with, or by display of, the victim's pistol or any other deadly weapon. Because the State proved no other aggravating factor, its evidence was therefore insufficient to convict the Defendant of aggravated robbery. Accordingly, we modify his conviction to simple robbery. We remand for resentencing.

## II. Variance Between Indictment and Jury Instruction

The Defendant next directs our attention to a variance between the language under which he was indicted for aggravated burglary and the language the trial court used when charging the jury regarding aggravated burglary. Count Two of the Defendant's indictment charges him with "enter[ing] the habitation of Clara Rita Groseclose, without the effective consent of the owner and with the intent to commit a felony and theft therein, in violation of Tennessee Code Annotated, Section 39-14-403, a Class C felony. . . ." (Emphasis added). That code section defines aggravated burglary as "burglary of a habitation." Tenn. Code Ann. § 39-14-403(a). Tennessee Code Annotated section 39-14-402(a) sets forth, in relevant part, that "a person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . not open to the public, with intent to commit a felony, theft, or assault." (Emphasis added). The indictment thus incorrectly charges the Defendant with the intent to commit both a felony and a theft in the victim's home, whereas either a felony or a theft suffices under the code. The trial court instructed the jury that a verdict of guilty required a finding that the Defendant "entered with the intent to commit a robbery, a felony, or a theft." Because all robberies are felonies, see Tennessee Code Annotated sections 39-13-401,-403, the trial court's instruction conformed to the requirements of the Tennessee Code.

The State correctly notes that the Defendant failed to object to this variance at trial, and he did not raise it as an issue in his motion for a new trial. He may therefore have waived the issue on two grounds. See Tenn. R. App. P. 36(a), Tenn. R. App. P. 3(e). We must treat this issue as waived unless it is deemed to be plain error. Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

Tennessee no longer follows the early common law rule requiring the indictment and the proof to conform in all respects. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "[B]efore a variance will be held to be fatal it must be deemed to be material and prejudicial." Id. The Tennessee Supreme Court has outlined the following rule for assessing whether a variance is prejudicial:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id. See also Berger v. United States, 295 U.S. 78, 82 (1935) (announcing the rule adopted in Moss).

We must first determine, therefore, whether Count Two of the indictment sufficiently informed the Defendant of the charges against him. The indictment correctly directs the Defendant to the code section under which he is being charged; that code section, in defining aggravated burglary, specifically refers to the immediately preceding section, Tennessee Code Annotated section 39-14-402, which defines burglary. The indictment thus sufficiently informed the Defendant that he was charged with aggravated burglary and that the State would be required to prove only his intent to commit a "felony, theft, or assault." Under these circumstances, the Defendant cannot credibly claim the variance rendered him unable to prepare a defense. He also cannot claim to have been misled by the indictment or surprised by the proof offered at trial.

We must next determine whether the variance is such that the Defendant could be prosecuted again for the same offense. It is not. The indictment and the proof offered at trial establish that the State prosecuted the Defendant for a March 29, 2005 burglary of Clara Rita Groseclose. The variance here does nothing to obscure the precise conduct prosecuted in this case, and therefore does not create the risk of a second prosecution for that conduct. Accordingly, we conclude that the variance was not prejudicial, and we need not reach the question of materiality. Because the trial

judge therefore violated no rule of law in instructing the jury, the Defendant has not established plain error.  This issue lacks merit.

### III.  Denial of Right to Jury Trial

The Defendant next contends that he was denied his right to a trial by jury.  He bases this argument on a few exchanges between the court and one of the Defendant's jurors regarding some hearing problems the juror was experiencing.  After four witnesses had testified, and while the court was directing jurors not to communicate with each other about the case, the following exchange occurred:

[The State]: Judge, if we could, I think some of the jurors are having trouble hearing.
[Juror]: Yes.
[The Court]: Okay, we had the microphone off.  Let me start all over because this is very important.  So I'll start back and read the whole thing again.
[Juror]: I have problems hearing you anyway.
[The Court]: Okay.
[Juror]: Do you want one of those thingies?
[Juror]: Yeah.
[Juror]: Can we have one of those amplifier [sic], please?
[The Court]: Yeah, we have those available . . . .
. . .
[The Court]: Does anybody else need an amplifier besides Mrs. Curtis?  Okay, you all go with the officer.  We'll make arrangements to have one of those brought over.  If you'd go with the—take the Jury out.
[Juror]: I'm sorry.
[The Court]: Juror Curtis indicates she was having some trouble hearing because she has a hearing problem.  And we're going to take this recess to get an amplifying device that's been furnished to the court.

After the jury returned from lunch, discussion about the hearing aid device continued:
[The Court]: Mrs. Curtis, have you been furnished with the amplifying device?
[Juror]: Yes, I have, sir.

[The Court]: Has the officer given instructions on how to operate it?
[Juror]: Yes, sir.  I can hear you fine now.  Thank you.
. . .
[The Court]: All right.  Would you be hesitant to speak up [in jury deliberations] and say, "I can't hear you"?
[Juror]: Yes.  No, I wouldn't be hesitant, no.

Following direct examination of the next witness, the trial court confirmed that Juror Curtis would immediately inform a court officer if anything went wrong with the hearing device.  Shortly thereafter she informed the court that the device had stopped working, saying "[i]t just went, sir."  The court took a recess to examine the device, then continued when it began to operate again.  A few minutes later, Juror Curtis again informed the court that the device had stopped working.  This time,

a court officer found and repaired a loose wire that had apparently caused the problem. The court again asked Juror Curtis to immediately speak up if the device malfunctioned again. It continued to work throughout the rest of the trial.

The State again correctly notes that the Defendant failed, at any time, to object to Juror Curtis' participation in the trial. The Defendant has thus waived this point of error, see Tennessee Rule of Appellate Procedure 36(a), unless he can successfully demonstrate plain error. Tenn. R. App. P. 52(b). We conclude that the trial court breached no clear and unequivocal rule of law, and thus, did not commit plain error. See Adkisson, 899 S.W.2d 641-42.

"The right to a trial by jury is a fundamental right preserved by article I, § 6 of the Tennessee Constitution and has 'special resonance in criminal matters.'" State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting Ricketts v. Carter, 918 S.W.2d 419, 424 (Tenn. 1996)). Tennessee Code Annotated section 22-1-102(b) provides that "[p]ersons not in the full possession of the senses of hearing or seeing shall be excluded from service on any jury if the court determines, of its own volition or on motion of any party, that such person cannot provide adequate service as a juror on such jury." "Unless there has been clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review." State v. Mickens, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003) (citing Lindsey v. State, 255 S.W.2d 533, 538 (Tenn. 1949)).

The Defendant argues that Juror Curtis failed to hear testimony both before and after she was provided with a hearing device. We disagree. Nothing in the record indicates that the trial court abused its discretion in failing to conclude that Juror Curtis had missed some or all of the testimony of the four witnesses that preceded her request for an amplifier. She simply stated that she "ha[d] problems hearing" the trial judge, even when he had his microphone on. Although the court did not specifically ask Juror Curtis whether she had missed any testimony, we conclude that her statements on the subject indicate, at most, that she had experienced some difficulty in hearing and wanted assistance.

The record contains no suggestion at all that Juror Curtis missed any testimony after the court provided her with an amplifier. The amplifier malfunctioned on two occasions; both times, Juror Curtis promptly notified the court, which ordered recesses to address the problem. This issue is therefore without merit.

## IV. Erroneous Expert Witness Jury Instruction

The Defendant next contends that the trial court improperly instructed the jury that Det. Quillen had been qualified as an expert in "gunshot wounds and gunshot stippling." The State again notes that the Defendant failed to object to this characterization and also failed to object to Det. Quillen giving his expert opinion at trial. The Defendant has therefore also waived this point of error, see Tennessee Rule of Appellate Procedure 36(a), unless he can successfully demonstrate plain error. Tenn. R. App. P. 52(b).

Unless qualified as experts, witnesses may only offer opinions or inferences which are both "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." This Court has held that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App., Jackson, July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

Although it elicited foundational testimony regarding his years of police experience and his familiarity with gunpowder stippling, the State stopped short of qualifying Det. Quillen as an expert in powder burn recognition. As a result, he testified as a lay witness when offering his opinions about the wound on the Defendant's face. This opinion testimony, however, was based on the sort of "specialized knowledge" not allowed under Rule 701. Id. The State specifically asked him to give his opinion based on his training and experience. This training and experience enabled him to recognize the Defendant's "road rash type injury" as gunpowder stippling. Had the Defendant objected, the trial court therefore should have excluded this evidence until Det. Quillen was qualified as an expert witness.

In the absence of an objection, however, the trial court did not commit plain error. True, Det. Quillen's opinion regarding the nature of the Defendant's facial injury tended to identify the Defendant as the victim's assailant. Absent this testimony, however, the jury still had more than sufficient evidence of the Defendant's identity, including the primer residue on his jacket, his later possession of the victim's purse and pistol, and the other testimony discussed previously. The admissions of the testimony therefore did not adversely affect any substantial right of the Defendant. Even if considered as error, we conclude the error was harmless. This Defendant is not entitled to relief on this issue.

**V. Sentencing**

The Defendant makes two sentencing claims: that the trial court improperly enhanced his sentence and that it improperly ordered consecutive sentences. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each

-14-

enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

### A. Improper Enhancement of Sentence

The Defendant argues that the trial court improperly enhanced his sentences for aggravated burglary and aggravated robbery.[4] Aggravated robbery is a Class B felony, while aggravated burglary is a Class C felony. Tenn. Code Ann. §§ 39-13-402(b), -14-403(b). As a Range I, standard offender, the Defendant was subject to sentencing ranges of eight to twelve years for the former, and three to six years for the latter. See Tenn. Code Ann. § 40-35-112(a)(2), (3). The trial court imposed the maximum sentence for each conviction, finding as enhancement factors that the Defendant had "a previous history of criminal convictions and criminal behavior, in addition to those necessary to establish the appropriate range" and that the victim "was particularly vulnerable because of age or physical or mental disability." Tenn. Code Ann. § 40-35-114(1), (4).

The Tennessee legislature recently amended several provisions of the Criminal Sentencing Reform Act of 1989, those changes becoming effective June 7, 2005. The trial court specifically sentenced the Defendant pursuant to the 2005 amendments. The Defendant's crimes occurred prior to that date, and he was sentenced after it. As such, the Defendant could have elected to be sentenced under the revised Act by executing a waiver of his ex post facto protections, be he did not. See Tenn. Pub. Acts ch. 353, § 18. Thus, he should have been sentenced under the 2003 codification of the Act. That sentencing scheme violated the Supreme Court's requirement that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi

---

[4]We note, of course, that we have modified this conviction and that the Defendant will be resentenced for simple robbery.

-15-

v. New Jersey, 530 U.S. 466, 490 (2000). The statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely v. Washington, 542 U.S. 296, 305-06 (2004).

The Defendant argues that the trial court violated his Sixth Amendment rights in considering the age and particular vulnerability of the victim, because those facts were not submitted to a jury and proved beyond a reasonable doubt. The Defendant concedes that, because he failed to object at sentencing to this consideration, we are limited to plain error review. The Defendant points to State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) (referred to herein as "Gomez II") to demonstrate plain error here.

In Gomez II, our supreme court held unconstitutional the enhancement of certain defendants' sentences based on their prior criminal histories, as authorized by Apprendi, but also based on two factors not submitted to a jury. Id. at 736. As in this case, the Gomez II trial court gave "great weight" to the defendants' criminal histories. Id. at 742. "That the trial court accorded 'great weight' to the [d]efendants' prior criminal histories, [did] not necessarily render irrelevant its application of [other enhancement factors]," however. Id. at 743. In the portion of its plain error review focusing on whether "consideration of the error [was] necessary to do substantial justice," Adkisson, 899 S.W.2d 641-42, the Gomez II court emphasized that, in order to avoid unconstitutionality, the record of a defendant's criminal history must be sufficiently well-developed to allow reliance on that factor alone in enhancing a sentence. Gomez, 239 S.W.3d 743. In Gomez II, the record, which demonstrated only one theft conviction, was not sufficiently well-developed. Id.

We are unable to conclude that the record in this case is sufficiently well-developed to support the maximum sentences based solely on enhancement for the Defendant's prior criminal history under Tennessee Code Annotated section 40-35-114(1). The court considered one felony conviction for burglary in Maryland, as well as four misdemeanor convictions, including two instances of reckless driving, one instance of public intoxication, and one instance of marijuana possession. We have determined that the Defendant's conviction for aggravated robbery must be modified to robbery. We have also determined that this case must be remanded for sentencing for the robbery conviction. Because it appears that the Defendant's sentence for aggravated burglary was improperly enhanced, in part, based on a factor prohibited by Blakely, we vacate the sentence imposed for that offense and remand for resentencing.

### B. Improper Consecutive Sentencing
The Defendant next contends that the trial court improperly ordered him to serve his sentence for aggravated burglary consecutive to his sentence for aggravated robbery. Tennessee Code Annotated section 40-35-115(b) lists the criteria a court must use to determine whether a defendant convicted of more than one criminal offense will serve the resulting sentences consecutively or concurrently. The trial court in this case ordered the Defendant to serve his sentences consecutively based only on its finding, by a preponderance of the evidence, that the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about

committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Although the decision between consecutive and concurrent sentencing is within the sound discretion of the trial court, see State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984), "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The court found that the Defendant's status as a dangerous offender was "certainly demonstrated by the way the gun was used, the struggle over the gun and the injury, breaking the window out, elderly lady there 83 years of age." Because the Defendant did not introduce any deadly weapon into his struggle with the victim, the court largely relied, in concluding that the risk to human life was high, on its conclusion that the Defendant knew the victim's age before entering her house. The trial court reasoned that the victim had turned off a light in her television room moments before starting up her stairs and that the room was therefore lit well enough to give the Defendant, standing outside her unobstructed window, a clear view inside. The record contains no evidence that the victim had turned a light off, however; the only light in the room came from the victim's television.

It is unclear whether her television emitted enough light to be noticeable outside her window; it is therefore also unclear whether or not the victim, when she turned off the television, alerted the Defendant to her presence inside the house. The record thus does not support a finding that the Defendant knew the victim's age, or knew of her presence, before entering her house.

Regardless, we conclude that the trial court did not abuse its discretion in finding that "the way the gun was used" and "the struggle over the gun" justified its classification of the Defendant as a dangerous offender. The Defendant, acting at night, chose to break into a home he had no reason to believe was unoccupied. Once inside, as evidenced by his deliberate disarming of the victim, he immediately perceived a person pointing a pistol at him. He unhesitatingly wrestled the victim to the ground, resulting in the uncontrolled discharge of the pistol's second bullet. Fortunately, the second shot only lightly injured the victim. The risk to her life was high, however.

The Defendant next argues that the trial court abused its discretion in sentencing him consecutively as a dangerous offender because it failed to find, as required by Wilkerson, that an extended sentence was necessary to protect the public from the Defendant, or that consecutive sentences reasonably related to the severity of the Defendant's offenses. We must agree. The record contains no consideration of the Wilkerson requirements. The trial court therefore failed to properly apply Tennessee Code Annotated section 40-35-115(b)(4) to impose consecutive sentences on the Defendant. Accordingly, we direct the trial court to revisit, during sentencing for the simple robbery conviction and resentencing for aggravated burglary, the issue of consecutive sentences.

**Conclusion**

-17-

Based upon the foregoing authorities and reasoning, we modify the Defendant's conviction for aggravated robbery to a conviction for simple robbery and remand for sentencing for that conviction. We also vacate the sentence imposed for aggravated burglary and remand for resentencing. We also remand for reconsideration of the consecutive nature of the Defendant's sentences. We otherwise affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE