In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-3506

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BILL S. CONN, SR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 CR 160—**Sarah Evans Barker**, *Judge.*

ARGUED APRIL 10, 2002—DECIDED JULY 16, 2002

Before RIPPLE, MANION and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Bill S. Conn, Sr., was convicted of one count of willfully dealing in firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D). He was sentenced to a two-year prison term. He now appeals his conviction and submits that expert testimony was admitted improperly. He further contends that the jury could not have convicted him on the sixth count after having acquitted him on five related counts. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Acting on a tip from a local firearms dealer, the Bureau of Alcohol, Tobacco and Firearms ("ATF") in cooperation with the Indiana State Police ("ISP") investigated the activities of Bill S. Conn, Sr., of Laurel, Indiana, a small town in the southeastern corner of the state, near Ohio. Specifically, the dealer suspected that Mr. Conn might be dealing in firearms without a license. The ATF and ISP cooperated in an undercover investigation designed to discover whether Mr. Conn was operating an unlicensed firearms dealership.

Over a three-month period, ISP officers and ATF agents acquired seven firearms on six occasions from Mr. Conn. On January 26, 2000, ISP Detective Ron Shoemaker went to Mr. Conn's farm. He told Mr. Conn that he was a felon, and that he worked for a trucking company. At first, Detective Shoemaker attempted to sell Mr. Conn two guns. They negotiated but Detective Shoemaker's asking price was too high. Detective Shoemaker then purchased a Davis Industries model D25, .25 caliber Derringer handgun. On February 10, Detective Shoemaker returned with ISP Detective Scott Stockton and purchased a Fratelli Tanfoglio model Titan II, .380 caliber pistol. On February 23, the two men returned and this time Detective Stockton traded two DeWalt drills for a Phoenix Arms model HP22, .22 caliber pistol. On March 6, Detective Stockton, again accompanied by Detective Shoemaker, traded a drill and chainsaw, along with $150 for a Taurus model PT92AF, 9 mm pistol. On April 17, 2000, Detective Stockton returned to Mr. Conn's farm with Jason Lowe, an ISP employee, who was then 19 years old. Lowe traded a Stihl Model 44 chainsaw for a Davis Industries model P380, .380 caliber pistol. Finally, on April 24,

2000, Detective Shoemaker and ATF Special Agent Mike Jaraczeski returned to Mr. Conn's farm. Agent Jaraczeski traded a television for a Lorcin Engineering model L380, .380 caliber pistol, and he purchased for $200 a Charter Arms model Undercover, .38 caliber revolver. The agents recorded each transaction on audiotape, and excerpts of these tapes were played for the jury at trial.

Once the undercover operation was completed, the ATF obtained a search warrant and seized 165 firearms and 10,000 rounds of ammunition from Mr. Conn's home, most of which were in one room (called the "gun room" by law enforcement agents and "Bill's room" by Mr. Conn's wife and adult son). Mr. Conn was arrested and indicted on six counts of willfully dealing in firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D). Each count of the indictment corresponded to a separate firearms purchase by the undercover officers.

## B. District Court Proceedings

In addition to the officers who made the undercover purchases, the Government presented the testimony of Alberta Mohler, Rodney Pollard, Leesa Wyatt, firearms dealer James Wulff, ATF Inspector Lisa Laughlin and ATF Special Agent Scott McCart, who had coordinated the investigation into Mr. Conn's activities. Inspector Laughlin testified about the nature of the federal licensing requirements for firearm dealers, including the forms that must be filled out with each firearm purchase. Mohler testified about her transactions with Mr. Conn involving six firearms that she had purchased from or sold to Mr. Conn in the late 1990s. Wulff testified about firearms he had sold to Mr. Conn as well as a firearm he had sold to Wyatt's husband, which had been stolen and ended up in the possession of Mr. Conn.

It was Rodney Pollard, a truck driver, who told Wulff about Mr. Conn's firearms cache after Pollard went to Mr. Conn's farm to sell some firearms. Pollard thought Mr. Conn's offer was too low and declined to sell him the firearms. Pollard told Mr. Conn that he might be interested in purchasing a hunting firearm for his son. Mr. Conn offered to sell him a .357, but Pollard thought the price was too high. Pollard also testified that while he was there, two young men came to Mr. Conn's farm and made a payment of some kind on a firearms purchase. The story of these young men was the subject of significant cross-examination by Mr. Conn's attorney. Apparently, the first time Pollard related this aspect of his experience was at trial.

Agent McCart was the Government's final witness. He testified about the items seized from Mr. Conn's house, including receipts for nine firearms Mr. Conn had purchased from individuals, 165 firearms and 10,000 rounds of ammunition. Agent McCart also narrated the presentation of a videotape made during the search and seizure, which the jury viewed during his testimony. After Agent McCart testified that the search had revealed eight different calibers of ammunition without a matching firearm in Mr. Conn's collection, the Government asked Agent McCart "whether or not the firearms recovered in the search warrant . . . are generally considered collector's items?" Tr.III at 417.

The Government prefaced its question by asking Agent McCart to base his answer on his "training and experience as an agent with the Alcohol, Tobacco and Firearms Bureau." *Id.* Mr. Conn objected. Mr. Conn's attorney stated that "I don't believe this witness is qualified to answer the question. I don't believe there is a proper foundation to establish that he is a firearm collector or has any knowledge of what is a collector's item or not." *Id.* The district court then permitted Mr. Conn's attorney to voir dire Agent Mc-

Cart. Mr. Conn's attorney asked whether Agent McCart was a firearms collector and whether Agent McCart went to firearm shows to look at firearm collections. Agent McCart responded to both questions in the negative. The Government then engaged in the following colloquy with Agent McCart:

> Q.  . . . . [A]s a part of your training and experience . . . have you been trained and have you dealt with the type of firearms that are collector's items based on their rarity and/or their value?
>
> A.  Yes, I have.
>
> Q.  And also as part of your training and experience, do you also receive information about firearms that are commonly used other than as collector's items, that is, used for other purposes?
>
> . . . .
>
> A.  Yes, I have.
>
> Q.  And based upon that training and experience that you've had, do you believe that you can tell the jury whether or not the firearms that are before the jury now, that is, Exhibits 35 through 199, are collector's items, or are they firearms used for other purposes?
>
> A.  Yes.

Tr.III at 418-19. After the voir dire, the district court overruled Mr. Conn's objection based on Agent McCart's qualifications and lack of a proper foundation. Agent McCart testified that he did "not believe that these firearms are collector's items. There are a couple that would have value to them, but the majority of them, no, are not collector's items." Tr.III at 420.

   The jury convicted Mr. Conn on Count 6 of the indictment, which concerned the April 24, 2000 sale to Detective

Shoemaker and Agent Jaraczeski. Mr. Conn was found not guilty on Counts 1 through 5 of the indictment. The district court sentenced Mr. Conn to two years of imprisonment and two years of supervised release.

## II

## DISCUSSION

Mr. Conn was convicted of "willfully," 18 U.S.C. § 924 (a)(1)(D), "engag[ing] in the business of . . . dealing in firearms" without a license, 18 U.S.C. § 922(a)(1)(A). The statute defines a "dealer" as "any person engaged in the business of selling firearms at wholesale or retail, any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or any . . . pawnbroker." 18 U.S.C. § 921(a)(11). A person "engaged in the business" of firearms dealing is one "who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). "[A] person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms," is not a firearms dealer. *Id.* Mr. Conn argued at trial that he was a collector of firearms who made periodic purchases and sales of firearms to enhance his personal collection and, therefore, he was not a firearms dealer within the statute's definition.

## A.

Mr. Conn first challenges his conviction on the ground that Agent McCart's testimony was admitted improperly

under Federal Rule of Evidence 702, which governs expert testimony. Specifically, Mr. Conn argues that the Government failed to demonstrate that Agent McCart was qualified to render an expert opinion about the nature of Mr. Conn's stockpile of firearms. Mr. Conn's principal argument was that his firearms were a personal collection, which he is entitled to augment through periodic purchases and sales. Agent McCart testified that, based on his training and experience as an ATF agent, Mr. Conn's firearms were not collector's items. On appeal, the Government argues that Agent McCart did not need to be qualified as an expert because his testimony was not offered as expert testimony under Rule 702, but as lay opinion testimony permitted by Rule 701. We review the district court's decision to admit evidence for an abuse of discretion. *See United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002).

### 1.

We first address the question whether Agent McCart's testimony is expert testimony subject to the constraints of Rule 702. The record is ambiguous as to whether the district court, in admitting the evidence, relied on Rule 701 or 702. The Government did not formally seek to admit Agent McCart's testimony under Rule 702, and the district court did not make clear whether it was admitting the testimony under Rule 701 or Rule 702.[1] However, a recent amendment to the Rules of Evidence makes clear that a submission of the sort at issue here must meet the criteria of Rule 702. Rule

---

[1] The district court did include a jury instruction about expert testimony. It is not clear whether that instruction applied to Inspector Lisa Laughlin, who testified about the federal licensing scheme for firearms dealers, Agent McCart, or both.

701 was amended, effective December 1, 2000, to emphasize that lay opinion testimony is limited to those observations of a lay witness that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The advisory committee notes state that

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. . . . [A] witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701, 2000 advisory committee note. The Advisory Committee notes also give a rather plenary explanation for this amendment. Before the 2000 amendment to Rule 701, some courts had become more lenient in the admission of lay opinion on subjects appropriate for expert testimony. *See* 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure: Evidence*, § 6253 at 119-23 (1997). The amendment was designed to make clear that courts must scrutinize witness testimony to ensure that all testimony based on scientific, technical or other specialized knowledge is subjected to the reliability standard of Rule 702.

Earlier decisions have explained helpfully the difference between lay and expert testimony. Lay opinion testimony most often takes the form of a summary of first-hand sensory observations. *See Asplundh Mfg. Div. v. Benton Harbor*

*Eng'g*, 57 F.3d 1190, 1196-1202 (3d Cir. 1995).[2] The opinion provides the jury with a more complete picture than would be provided by a recitation of each component fact. "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001). Expert opinion, by contrast, need not be based on first-hand knowledge of the facts of the case. It brings to an appraisal of those facts a scientific, technological or other specialized knowledge that the lay person cannot be expected to possess.

We must conclude that the testimony offered by Agent McCart about the nature of Mr. Conn's firearms collection was expert testimony. During voir dire, the Government asked Agent McCart to base his answer on his "training and experience" as an ATF agent. He was not asked to summarize his observations in the form of an opinion; rather, he was asked to view Mr. Conn's firearms collection in light of

---

[2]  In *Asplundh*, a case cited favorably by the Advisory Committee, the Third Circuit offered this helpful summary of lay opinion testimony:

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences. . . . Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property.

*Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196-98 (3d Cir. 1995) (Becker, J.).

his training and experience with firearms. Even a lay person familiar with firearms in general would not have the expertise to distinguish between firearms that are collector's items and firearms that are not. Agent McCart's opinion was unnecessary as a descriptive tool. The jury was shown pictures of Mr. Conn's firearms, the number and type of firearms were entered into evidence, and Agent McCart described the firearms in detail while narrating a videotape recorded during the ATF search of Mr. Conn's house. Agent McCart was assisting the jury by applying his years of ATF experience to give the jurors a better understanding of the nature of Mr. Conn's firearms stash. Agent McCart's testimony was not based only on his observations; rather, the testimony was based on his accumulated expertise obtained through experience and training.[3] He was asked to draw upon his accumulated knowledge and to provide information to the jury about the appropriate characterization of Mr.

---

[3] *Compare United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001) (testimony of FBI agent about code words used in recorded calls was admissible as lay opinion testimony when it was based on his "extensive participation in the investigation of *this* conspiracy, . . . [which] allowed him to form opinions concerning the meaning of certain code words used in *this* drug ring based on his personal perceptions") (emphasis added), *with United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (bank examiner went beyond "straightforward conclusions from observations informed by his own experience . . . [and] functioned not as a witness relaying his own observations so much as a knowledgeable bank examiner who could provide the jury with an overview of banking regulations and practices" and therefore his testimony could not be offered under Rule 701). Here, Agent McCart is not testifying about what he learned about Mr. Conn's firearms collection during Agent McCart's investigation of Mr. Conn; rather, he is offering an opinion about the nature of firearms in general and how Mr. Conn's specific collection fits into this picture.

Conn's firearms: would the firearms market consider these weapons to be collector's items or suitable only for use as firearms? Testimony of this nature is expert testimony; it could have been offered by any individual with specialized knowledge of the collector's market in firearms. It did not have to be offered by one of the investigating agents.

### 2.

Having determined that Agent McCart's expert testimony is subject to Rule 702, we must determine whether that testimony met the criteria set forth in that Rule. As we have noted earlier, Rule 702 has been amended to reflect the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Fed. R. Evid. 702, 2000 advisory committee note. Expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

With respect to the first prong of this test, Agent McCart testified that, as an ATF agent, he was trained to deal with and had dealt with firearms that are collector's items. Agent McCart also indicated that he received "information about firearms that are commonly used other than as collector's items." Tr.III at 419. Mr. Conn nevertheless argued at trial that Agent McCart was not qualified because he was not a firearms collector and did not go to firearms shows to determine what firearms were collected. Although one might become an expert in firearm collections in the manner suggested by the defense, it is not the only path to such a qualification. Rule 702 is flexible and permits a witness to be

qualified as an expert if he is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. We believe that the record adequately establishes that Agent McCart's opinions, based on his accumulated training and experience in dealing with firearms that were collector's items and those that were not, combined with his inspection of the firearms found in Mr. Conn's stash, were grounded in sufficient facts and data.

The second prong of the test set forth in Rule 702 requires that the testimony be the product of reliable principles and methods. In *Daubert*, the Supreme Court set forth five factors to guide a court in assessing the reliability of scientific expert testimony. Those now-familiar factors are: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique or method has met with general acceptance. *Daubert*, 509 U.S. at 593-94. In *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court held that the *Daubert*'s "gatekeeping" obligation applies not only to "scientific" expert testimony, but to all kinds of expert testimony. Indeed, as the Court noted, Rule 702 makes no distinction between "scientific" knowledge and other forms of specialized knowledge. *See id.* At the same time, the Supreme Court acknowledged that, although the fundamental task of the trial court remains the same no matter what sort of specialized information is proffered, the *Daubert* factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge. *See id.* Using the *Daubert* factors as a point of departure, the district court is free to fashion an approach more precisely tailored to an evaluation of the particular

evidentiary submission before it. In reviewing that determination, we are to apply the deferential abuse-of-discretion standard. *See Kumho Tire*, 526 U.S. at 141.

In applying these principles, we have said that "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). Indeed, we have noted specifically that "genuine expertise may be based on experience or training." *Id.* As we pointed out in *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001), the Advisory Committee notes to Rule 702 specifically note that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 advisory committee note.

Earlier cases reflect that courts of appeals have sanctioned the reliance of trial courts on established law enforcement methodologies to fulfill the mandate of Rule 702. For instance, expert testimony has been admitted frequently in firearms prosecutions to establish that the firearm in question traveled in interstate commerce. *See, e.g., United States v. Corey*, 207 F.3d 84, 85, 88-89 (1st Cir. 2000); *United States v. Vincent*, 20 F.3d 229, 236-37 (6th Cir. 1994). Of particular help in the present case are those situations in which trial courts have admitted the testimony of law enforcement officers about the modus operandi of narcotics dealers. *See, e.g., United States v. Ortega*, 150 F.3d 937, 943 (8th Cir. 1998). Our circuit has permitted regularly such an approach. *See United States v. Doe*, 149 F.3d 634, 636-38 (7th Cir. 1998); *United States v. Hubbard*, 61 F.3d 1261, 1274-75 (7th Cir. 1995); *United States v. Lipscomb*, 14 F.3d 1236, 1239, 1242 (7th Cir. 1994); *see also* Walter G. Amstutz & Bobby Marzine Harges, *Evolution of Controversy: The Daubert Dilemma: The Application of Daubert v. Merrell Dow Pharmaceuticals, Inc. to Expert Testimony of Law Enforcement Officers in Narcotics Related Cases*, 23 U. Haw. L. Rev. 67, 100-07 (2000) (collecting

cases). Experts in narcotics dealing typically are qualified based upon their field experience. *See United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001); *United States v. Griffith*, 118 F.3d 318, 321-22 (5th Cir. 1997). Courts have looked to the agent's years of experience as well as the number of narcotics cases in which the agent was involved. *See Griffith*, 118 F.3d at 322-23; *Hubbard*, 61 F.3d at 1274; *United States v. Cotton*, 22 F.3d 182, 185 (8th Cir. 1994). In these cases, experienced narcotics investigators applied the knowledge gained through years of experience and, essentially, described for the jury what they knew about narcotics dealers.

Agent McCart's testimony is based on a similar methodology. He was asked to appraise, on the basis of his past experience and training, the value of the firearms found in Mr. Conn's residence. On this record, we cannot say that the district court abused its discretion in determining that the evidence ought to be allowed. The situation here is not, however, a paradigmatic example of how such an issue ought to be developed at trial. The Government never actually sought to have the agent certified as an expert and, indeed, on appeal, has argued that his testimony was not expert testimony. We do not believe that this infirmity is fatal because the agent was required to state the basis of his expertise, and the defense counsel was given ample opportunity to examine the agent about his background before the court determined to go forward with the testimony. *See Griffith*, 118 F.3d at 322.

We also note that the agent's description of his training and experience was somewhat less than specific. For example, Agent McCart was asked whether his training and experience dealt with firearms that are collector's items. He responded in the affirmative, but no information was elicited about the nature of his training, or how many cases he had worked, or other details of his experience. The defense nevertheless had the opportunity during voir dire to cross-

examine him about his experience and training, but chose to limit its questions to Agent McCart's status as a firearms collector and to the nature of his trips to firearms shows. Had the defense had other concerns about the quality of Agent McCart's training, the quantity of his experience, or the methodology that he employed in reaching his assessment of Mr. Conn's firearms, it could have raised those questions during voir dire. In sum, we must conclude that the agent employed a recognized and valid methodology when he characterized the nature of Mr. Conn's firearms on the basis of his earlier training and experience with both collectible firearms and those that were not.

The third prong of the Rule 702 analysis requires that the expert witness apply his methodology to the facts of the case with accuracy. Although the entire record on the admissibility of this testimony is less than well-developed, we cannot say that the district court abused its discretion in this regard. The defense chose not to challenge the actual application of Agent McCart's training and experience to the facts of the case, although it had an opportunity to do so. Nor does the record contain any hint that the agent based his opinions on anything other than the factors that he articulated. The agent was never asked why, on the basis of his training and experience, he believed that the firearms that had been recovered from Mr. Conn's residence could not be characterized as collector's items. In light of the defense's decision not to explore these matters further when given the opportunity to do so by the district court before proceeding with the testimony at issue, we cannot say that the district court made a fatal misstep in this regard.

## B.

Mr. Conn also submits that his conviction must be overturned because of the alleged inconsistency between the

jury's verdicts on Counts 1-5 and its verdict on Count 6. He further maintains that the Government did not present sufficient evidence that Mr. Conn's firearms were not a personal collection. Mr. Conn did not move for a new trial under Federal Rule of Criminal Procedure 33, nor did he move for a judgment of acquittal under Rule 29(c). Therefore, we review these contentions for plain error. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993); *United States v. Nobles*, 69 F.3d 172, 182-83 (7th Cir. 1995).

"Inconsistent verdicts in a criminal case are not a basis for reversal of a conviction or the granting of a new trial." *United States v. Reyes*, 270 F.3d 1158, 1168 (7th Cir. 2001). As the Supreme Court has held, "inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the government at the defendant's expense." *United States v. Powell*, 469 U.S. 57, 65 (1984). The jury may have reached such a verdict "through mistake, compromise or lenity." *Id.* Furthermore, in this case, it is not even clear that the verdicts are inconsistent.[4]

Whether the verdicts are inconsistent or not, the jury heard ample evidence on which to base its conviction. The Government presented evidence of six undercover firearms purchases over the course of three months. The jury heard the testimony of Rodney Pollard, who described his negotiations with Mr. Conn over the purchase and sale of several

---

[4] The Government argues, for example, that the jury could have concluded that, after hearing evidence about the five other undercover firearms purchases, that it was only after the sixth sale that Mr. Conn met the statutory definition of a firearms dealer. In that case, the verdicts would not be inconsistent because the jury would have found that Mr. Conn was not a dealer on each of the first five occasions, but that his conduct had reached the point that he met the statutory definition on April 24, 2000.

different firearms. Pollard also testified that he witnessed other individuals coming to Mr. Conn's home to make payments on an earlier firearms purchase. The Government presented evidence that Mr. Conn was willing to sell a firearm to Detective Shoemaker, even after Shoemaker told him that he was a convicted felon. Alberta Mohler testified about her transactions with Mr. Conn, which included purchases for her boyfriend and the sale of six firearms to Mr. Conn over several years. Finally, the jury heard the testimony of Agent McCart who testified about the volume and nature of Mr. Conn's firearm collection and the many firearms seized from Mr. Conn's "gun room." On the basis of this evidence, the jury was entitled to conclude that Mr. Conn was willfully dealing in firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D).

### Conclusion

The district court did not abuse its discretion in admitting the testimony of Agent McCart. There was ample evidence to support Mr. Conn's conviction and any inconsistency between the verdicts does not require reversal. Therefore, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*