In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3102

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFREY PARKHURST,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:15-cr-20051-CSB-EIL-1 — **Colin S. Bruce**, *Judge.*

ARGUED MAY 22, 2017 — DECIDED JULY 25, 2017

Before FLAUM, EASTERBROOK, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Jeffrey Parkhurst was convicted at trial of attempting to entice a minor to engage in sexual activity and was sentenced to one hundred thirty-two months' imprisonment. On appeal, Parkhurst challenges his conviction and sentence. We affirm both.

**I. Background**

From January to July 2015, Jeffrey Parkhurst posted a series of internet advertisements on Craigslist's "casual encounters" section. On July 20, for example, Parkhurst posted the following ad:

> Gentleman Lookin For Young Son – m4m[1] (springfield)
>
> Tryin to find a very young white boy in order to spend some quality time together….he would be a little fella . kinda thin built . not too tall . clean kept . little to no body hair . average to good looking . (easy on the eyes lol) a little white guy who is friendly and fun to be around…sense of humor helps…18 or slightly older (younger the better)…must like to have a good time(not just sensual speaking)…prefer you to be a virgin . as far as guys are concerned . as I am myself one…like to do many different things that are fun …. must enjoy being close . being touched . massaged . rubbed all over with warming oil in a dim lit room and made to feel very erotic and sexy….nothing ever forced on you…goal is only to make you feel so good you will not want it to end ….ever lol….we can try about anything you have ever wondered about…you only need to ask !... Me ?... just an older discrete white guy that's your age at heart and built like a teenager who just needs a discrete little friend to spend good times with…a

---

[1] "Male for male."

> reply only cost ya a little time and may be the best thing you have done in a long time….be safe…be cool…be happy !!! Not looking for older guys so don't waste your time or mine . thank you !

(ellipses in original).[2]

One week later, Decatur Police Detective Todd Koester discovered Parkhurst's advertisement and responded using an undercover persona of 15-year-old "Kacy Lillard." Kacy (Detective Koester) and Parkhurst then exchanged text and email messages for the next eight and a half hours:

- Kacy initiated the interaction, stating, "just wanted to say hi. im probably to[o] young but i am 15 and liek to hang out."[3] Parkhurst responded, "You are only too young if you can't keep a secret lol . Hi buddy :)"

- Parkhurst stated that he "[w]ould love to give [Kacy] an erotic sensual massage covering every inch of [his] body in a candle lit room with a warming massage oil and supplies to do whatever [he] want[ed] to try."

- Parkhurst asked Kacy whether he was "cut or uncut …. referring to [Kacy's] penis." Upon learning that Kacy was "cut," Parkhurst stated, "Really glad ur cut , so am I."

---

[2] Parkhurst's advertisement included a number of typographical, grammatical, and spacing errors that we have quoted without using "[*sic*]." For the remainder of this opinion, the spelling and grammar appear as originally written unless altered with brackets.

[3] Later, Kacy messaged that he was "16" years old. Detective Koester testified that this variation was unintentional.

- Parkhurst proposed that he and Kacy "experiment and explore together and only try what both of [them] want[ed] to try."

- Parkhurst expressed that he "[m]ay like to try and suck [Kacy]."

- In response to Kacy's question, "U think any of its gonna hurt?," Parkhurst answered, "I've been studying up on the subject so I know what to do to prepare you so it won't hurt ! And I would not hurt you for the world buddy….I will be extra careful buddy cause I want both of us to want to do this over and over and not just a one time deal lol."

Eventually, Parkhurst and Kacy agreed to meet that night. Parkhurst planned to pick Kacy up at his Decatur apartment (where Detective Koester and other officers would be stationed) at 11:30 PM after Kacy's mother left for work. Parkhurst would take Kacy to a truck stop for dinner, to Parkhurst's Springfield home for the night, and back to Decatur by 7:30 AM the next morning before his mother returned. Kacy messaged that he would need to shower and pack a bag for the night, and Parkhurst responded, "Cool make sure ya clean ur self extra good all over lol and i'll know if ya do later." While traveling to Decatur, Parkhurst offered to purchase Kacy some candy, and stated, "[J]ust gotta promise not to eat them all on the way back here lol." Kacy asked, "Lol I won't. Y not?," and Parkhurst responded, "Not my kinda candy ! It's all yours buddy….I'm pretty much gonna spoil you anyway so get used to it ok ?"

At about 11:30 PM, Parkhurst arrived at the Decatur address Detective Koester had provided, and the police

promptly arrested and interviewed him. Detective Koester asked how old Parkhurst had believed Kacy was, and Parkhurst answered, "I assumed I was—well, at one point you said you were sixteen. So I assumed I was talking to a fifteen or sixteen year old." Parkhurst added, however, that he had believed Kacy may have been lying about his age given the multiple reported ages. Parkhurst acknowledged that he had implicitly referenced oral sex in his conversation with Kacy, and when asked whether someone reviewing Parkhurst's exchanges with Kacy could reasonably conclude that Parkhurst had intended to engage in sexual activity, Parkhurst responded, "Probably."

In a one-count indictment, the government charged Parkhurst with attempting to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). After a trial, a jury found Parkhurst guilty, and the district court sentenced him to one hundred thirty-two months' imprisonment and fifteen years of supervised release. This appeal followed.

## II. Discussion

Parkhurst appeals both his conviction and his sentence. He requests a new trial by challenging the admission of parts of Detective Koester's testimony and the government's use of certain emails during cross-examination and in closing arguments. Parkhurst seeks resentencing based on the trial court's use of an obstruction enhancement. We review for an abuse of discretion the district court's evidentiary rulings, *United States v. Williams*, 272 F.3d 845, 856 (7th Cir. 2001) (citation omitted), and sentence-enhancement decisions, *United States v. Vasquez-Hernandez*, 834 F.3d 852, 854 (7th Cir. 2016).

**A. Detective Koester's Testimony**

Detective Koester served at trial as a dual fact-expert witness, discussing both his interactions (as Kacy) with Parkhurst and his experience involving internet crimes against children. Parkhurst challenges as unreliable two particular portions of Detective Koester's testimony: his understanding of Parkhurst's (1) "candy" comments, and (2) July 20 Craigslist ad. Lastly, Parkhurst contends that Detective Koester's dual fact-expert witness role confused the jury. We consider each argument in turn.

*1. "Candy" Conversation*

Parkhurst first challenges the admissibility of Detective Koester's testimony regarding a candy-related conversation he had (as Kacy) with Parkhurst. During direct examination, Detective Koester described his understanding of the conversation:

> Q: Okay. And then the rest of that portion of the conversation talks about your preference of candy, hard or chewy, et cetera. And then at 8:44 p.m., tell us about this portion of the conversation.
>
> A: He responds at 8:44 saying, "Cool, just gotta promise not to eat them all on the way back here, LOL."
>
> Q: And then your reaction?
>
> A: At 8:50 I respond, "LOL, I won't. Why not?"
>
> Q: And what does he say?
>
> A: "Not my kind of candy. It's all yours, buddy."

Q: And what do you interpret that portion of the conversation to mean?

A: At that point, I'm thinking he doesn't want this 15-year-old kid to eat a lot of candy because it's gonna interfere with the sexual activity that's supposed to take place.

Defense: Objection, speculation.

Court: Overruled. He can – he's testifying as to what he understood the conversation in which he is a part of [*sic*]. Overruled.

A: So, I'm thinking that he doesn't want this kid to eat all this candy and get full because of the sexual activity that's gonna take place; he doesn't want him to be sick.

(internal quotation marks added). Parkhurst asserts that this was expert testimony under Federal Rule of Evidence 702, and argues that the testimony lacked the necessary discussion of "methodology, expertise, or scientific method." The government, however, contends that this was lay-witness testimony, subject to Rule 701's less-strict standards.

Under Rule 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. We review decisions to admit lay-opinion testimony pursuant to Rule 701 for abuse of discretion. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 547 (7th Cir. 2011) (citation omitted). Rule 702 expert testimony, on the other

hand, is based on a witness's knowledge, skill, experience, training, or education, and must be based on sufficient facts and reliable principles and methods. Fed. R. Evid. 702. The standard of review is also different: We review de novo whether the court applied the required Rule 702 framework, and for an abuse of discretion the court's decision to admit or exclude the expert testimony. *United States v. Pansier*, 576 F.3d 726, 737–38 (7th Cir. 2009) (citation omitted).

Taken together, the government's examination, Detective Koester's answers, and the district court's ruling made clear that Detective Koester's testimony about the "candy" conversation was based on his perception of the conversation at the time it occurred—classic Rule 701 lay-witness testimony. The government, for example, inquired about Detective Koester's "reactions" to Parkhurst's messages, and Detective Koester explained his view of the conversation "at that point." And the district court cleared up any confusion regarding the basis for Detective Koester's answers when the court overruled Parkhurst's speculation objection, clarifying that the detective was testifying about his understanding of the conversation at the time he was participating in it. As such, this testimony need only satisfy Rule 701's requirements. The district court held that it did, and we see no abuse of discretion in admitting it.

### 2. *July 20 Craigslist Advertisement*

Detective Koester was qualified as an expert without objection and gave expert testimony on the ways in which child predators use certain key words in Craigslist advertisements

to evade detection,[4] basing his awareness on years of experience in investigating online child abuse and on relevant training.[5] Detective Koester then testified about his particular understanding of Parkhurst's July 20 Craigslist ad:

> Q: Now, I believe your testimony yesterday discussed certain parts of advertisements that you look for that are indicative to you, based on your training and experience, of individuals who may be seeking a minor. What parts of [Parkhurst's] ad struck you [when you first saw it on July 27]?
>
> A: Well, the first line, "very young white boy, a little fella." The "18 or slightly older," right in parentheses after that, "younger the better," that struck me as something that somebody — okay, I'm complying with Craigslist rules by putting 18 or slightly older, but I'm —
>
> Defense: Objection, speculation.

---

[4] Detective Koester testified that he had learned how to identify suspects who may be committing crimes against children online and about these suspects' methods and means of committing such crimes. He also explained Craigslist to the jury, describing the website's advertisements service, its "flag" function (used to identify illegal practices), and its popularity among child-predators.

[5] The government proffered Detective Koester as an expert witness in online child-abuse investigations, presenting his (1) level of education (a Master of Science degree); (2) experience in conducting over twenty-five online investigations involving crimes against children; (3) relevant training for online undercover investigations for which he had received certifications; and (4) attendance at related regional and national conferences.

Government: Your Honor, this witness has been qualified as an expert and can testify to his training and experience and why this ad struck him.

Court: The objection's overruled actually for the reasons [the government] states. He's been qualified as an expert in online investigations. He's able to testify as to … his experience and give his expert opinion.

A: The — in parentheses right after the "18 or slightly older" where it says "the younger the better," that's a way for people to get around the Craigslist terms and conditions basically without saying younger. That's just a hint to people reading it. "Prefer you to be a virgin." Built — basically him describing himself as built like a teenager. Those are the main things that struck me.

Q: Okay. Now, you had testified that the "18 or slightly older" but in parentheses "younger the better" was, in your opinion, a way to get around the Craigslist terms of use; is that right?

A: Correct.

Parkhurst argues that Detective Koester's expert testimony was inadmissible under Rule 702 because the court did not determine whether Detective Koester's investigative methods "ha[d] been tested, … subjected to peer review and publication, whether there [was] a known rate of error, [or]

whether there [was a] general acceptance in the field in evaluating the reliability of the proffered testimony." *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). He also asserts that this testimony constituted an opinion about Parkhurst's subjective motivations in violation of Rule 704(b), imputing to Parkhurst the nefarious intent of targeting minors with his advertisement.

At the outset, "[E]xpert testimony must be helpful to the jury to be admissible." *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2010). Detective Koester first described Craigslist's "flagging" function that identifies and blocks improper uses of Craigslist features by scrutinizing the words users include in their advertisements. He then presented and interpreted various "[k]ey words"—such as "young," "fresh," and "barely used"—that, in his experience, individuals use to target minors without running afoul of Craigslist's regulations. Finally, he highlighted which words in Parkhurst's advertisement appeared, based on his expertise, to constitute such key words. We see no appreciable difference between this testimony and that of narcotics officers describing "code words" for drugs that we have previously deemed helpful to the jury. *See United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) (concluding that an FBI agent's expert testimony about the meaning of the words "six, "nine," "five dollar," and "fifty-five" within a conversation was helpful); *United States v. Ceballos*, 302 F.3d 679, 689–88 (7th Cir. 2002) (concluding that DEA agents' interpretations of "it," them," and "both" as referring to methamphetamine shipments was helpful). Detective Koester's key-word testimony helped the jury apply to the evidence alternative theories of which they ordinarily may not have been aware. *See Ceballos*, 302 F.3d at 687–88; *see also United States v. Christian*, 673 F.3d 702, 711 (7th Cir. 2012)

("What might seem like innocuous conduct to an untrained jury, might, to the trained eye, be indicative of criminal activity.").

Parkhurst's focus on scientific-reliability factors is misplaced. Detective Koester's expert testimony was based on his extensive training and experience in over twenty-five investigations involving internet crimes against children. Training and experience are proper foundations for expert testimony. Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citations omitted) ("the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). We have repeatedly allowed such expert testimony without requiring "scientific methodologies" or "peer review." *See United States v. Conn*, 297 F.3d 548, 555–56 (7th Cir. 2002) (citing cases); *see also id*. at 556 ("[T]he *Daubert* factors … ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge … . [W]e have noted specifically that genuine expertise may be based on experience or training.") (citations and internal quotation marks omitted). Instead, district courts ruling on the admissibility of expert testimony of investigating law-enforcement officers may review factors such as the officer's years of experience and number of investigations. *See id*. (citations omitted). The district court in this case did just that, and, in light of Detective Koester's extensive experience investigating internet

crimes against children, it was not an abuse of the court's discretion to qualify Detective Koester as an expert witness or to admit his expert testimony regarding Craigslist advertisements.[6]

Parkhurst's contention that Detective Koester's testimony violated Rule 704(b) meets the same fate. Normally, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). We have explained, however, that,

> when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made

---

[6] Expert testimony regarding "code words" may inherently be untestable in a scientific manner given the ever-changing nature of these words over time and across groups of individuals. While this may call for heightened scrutiny by trial courts (*i.e.* through specific, cautionary jury instructions) or vigorous cross-examination by opposing counsel regarding the testimony's believability or applicability, it does not render the testimony inadmissible due to unreliability. In the related context of code words in narcotics cases, we have noted: "Experts need not establish that certain words have fixed meanings only in the narcotics world or in the particular conspiracy before they can interpret those words. Experts can determine, *based on their expertise*, that certain words have drug-related meanings within the context of a single conversation." *York*, 572 F.3d at 424 (emphasis added). The same principle applies here. Detective Koester testified, based on his expertise in internet crimes against children, about certain "key words" that refer to minors in the context of Craigslist advertisements. Based on our precedent, the basis of this testimony was sufficiently reliable.

clear, either by the court expressly *or in the na-ture of the examination*, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.

*United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir. 1994) (emphasis added); *see also United States v. Winbush*, 580 F.3d 503, 512 (7th Cir. 2009) ("Although an expert may not testify or opine that the defendant actually possessed the requisite mental state, he may testify in general terms about facts or circumstances from which a jury might infer that the defendant intended to [commit the charged crime]."). What matters is the degree to which the expert refers to the specific defendant's intent; expert testimony is proper as long as it leaves for the jury the ultimate conclusion that the defendant intended to commit the charged crime. *Id*. (citation omitted). Here, the government's examination made it clear that Detective Koester's testimony regarding the July 20 Craigslist advertisement was based on his background knowledge of criminal activities on Craigslist and not on Parkhurst's mindset. The government asked Detective Koester what about the advertisement had stood out to him, "based on [his] training and experience."[7] He then identified and interpreted various words in

---

[7] Indeed, the government referred to Detective Koester's testimony from the previous day, in which the detective had explained his knowledge of common online-predator practices:

> Q: Okay. Are there other indicators within the ad that you are trained to look for to determine whether or not that person is looking for an adult or looking for a minor?
>
> A: Yes.

Parkhurst's advertisement that, based on his experience, re-sembled "[k]ey words" that other individuals have used to target minors without violating Craigslist's regulations. De-tective Koester never mentioned Parkhurst's "intent" or "mindset," and he never directly testified that Parkhurst in-tentionally sought to sexually entice minors—which is what our precedent prohibits. *See, e.g.*, *United States v. Collins*, 715 F.3d 1032, 1038 (7th Cir. 2013) (expert testimony admissible where officer's testimony was not based on "some special fa-miliarity with the workings of [the defendant's] mind") (inter-nal quotation marks omitted); *United States v. Are*, 590 F.3d 499, 513 (7th Cir. 2009) ("We affirmed the district court's deci-sion to allow the expert testimony because the officers testi-fied that their opinions were based on their knowledge of 'common practices in the drug trade' and not on 'some special familiarity with the workings of [the defendant's] mind.'") (ci-tations omitted); *United States v. Blount*, 502 F.3d 674, 679–80 (7th Cir. 2007) (approvingly noting that the testifying officer "never referred to [the defendant's] 'intent' or 'intentions'"

---

Q: What are some of the things that you look for?

A: Key words such as "young, fresh, barely used," just certain terms throughout the ad that — kind of their way to disguise their posting so it doesn't get re-moved by Craigslist, yet to convey to their audience what they're looking for.

Q: And did you find an ad on July 27th, 2015, that was actually posted about a week earlier, on July 20th, 2015, with the title Gentleman Looking For Young Son, dash, M4M, in parenthesis, Springfield?

A: That is correct.

and holding that the officer's expert testimony "did not transgress Rule 704(b)'s limitations"); *Lipscomb*, 14 F.3d at 1242 (no Rule 704(b) violation where an expert testified "that a certain pattern of conduct evinces a particular kind of criminal activity"). No reasonable juror could have believed that Detective Koester's testimony was based on some special knowledge of Parkhurst's intent. Considering the examination as a whole, the testimony did not violate Rule 704(b).

### 3. *Dual Role*

As a final matter, Parkhurst claims that Detective Koester's dual role as a fact-expert witness confused the jury. However, we routinely uphold the practice of presenting dual fact-expert witnesses, "particularly where experienced law enforcement officers were involved in the particular investigation at issue." *York*, 572 F.3d at 425 (citation omitted); *see also United States v. Lightfoot*, 224 F.3d 586, 589 (7th Cir. 2000) ("there is nothing wrong with having a police officer testify both as a fact witness and an expert witness") (citation omitted). True, there are "inherent dangers with this kind of dual testimony," such as jury confusion, *id*. (citations omitted), but this "potential for prejudice … can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert." *Id*. (quoting *United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002)). These precautions tell the jury what it needs to know to determine how much weight to give the testimony and the opposing counsel what he needs to know to cross-examine the witness effectively. *United States v. Moreland*, 703 F.3d 976, 983–84 (7th Cir. 2012).

Contrary to Parkhurst's assertions, the district court and government took appropriate precautions against the potential for jury confusion. The district court instructed the jury as follows:

> You have heard witnesses, [including] … Detective Todd Koester, who, in some instances, gave opinions and testimony about certain subjects, specifically, … online investigations involving minors. You do not have to accept these witnesses' opinions or testimony. You should judge these witnesses' opinions and testimony the same way you judge the testimony of any other witness. In deciding how much weight to give to these opinions and testimony, you should consider the witnesses' qualification, how they reached their opinions or conclusions, and the factors I have described for determining the believability of testimony.

While it is advisable that trial courts distinctly instruct jurors to not give the witness's lay testimony any extra weight simply because the witness is an expert, we have previously deemed acceptable instructions nearly identical to this one. *See Moreland*, 703 F.3d at 984. Furthermore, as described in more detail above, the government's examination made clear the basis for Detective Koester's answers—that is, whether a given answer was fact testimony regarding the investigation in this case (*i.e.*, Rule 701 testimony) or expert testimony derived from his experience in similar investigations (*i.e.*, Rule 702 testimony). This is all we require of the examining party. *See id.* at 983–84; *see also id.* at 983 ("Telling the jury that a witness is both a lay witness and an expert witness and will be

alternating between the two roles is potentially confusing—
and unnecessary."). As such, Detective Koester's dual testi-
mony was unproblematic.

## B. Parkhurst's Emails

Parkhurst next argues that the government inappropri-
ately questioned him about email communications with other
individuals who had responded to his casual-encounter ad-
vertisements.[8] He additionally argues that the government
committed prosecutorial misconduct by referring to stricken
evidence related to these communications during its closing
arguments.

---

[8] Below are relevant portions of a few of the emails the government
referenced during cross-examination:

- Exhibit 19B: Parkhurst corresponded with a purported 14-year-
  old male, writing, "I would just like to give you a full body mas-
  sage and just see where it ends up , promise you will enjoy it for
  real :) only will do whatever you want to at the moment and
  would never force anything on you I promise you that !!!"

- Exhibit 19D: Parkhurst corresponded with a purported 15-year-
  old male named Hunter. When Parkhurst learned of the pur-
  ported minor's age, he responded, "You would have to be able to
  keep this totally secret and not tell a single person, not even your
  best friend , nobody !!!!!"

- Exhibit 19G: Parkhurst corresponded with a purported 20-year-
  old male who represented that he was "160 5'10 6.5 cut straight"
  and had not "been with a guy in a while." Parkhurst replied,
  "Even though I do like the pic you sent, I am really kinda looking
  for someone like myself that has not done anything yet with a guy
  … ."

### 1. Evidentiary Rulings

Parkhurst first argues that the district court incorrectly ruled that Parkhurst had "opened the door" to cross-examination on his emails. During direct examination, however, Parkhurst discussed his internet advertisement and associated communications, and asserted that he only wanted to interact with of-age individuals, *i.e.*, those eighteen years or older:

> Q: Okay … when you posted your ad, what were you hoping to accomplish?
>
> A: I was hoping to meet someone of age and develop a relationship with them.
>
> …
>
> Q: When you were emailing back and forth with Detective Koester's undercover fake personality[,] Kacy, what were you hoping to accomplish? Be honest.
>
> A: If this person was actually of age, I was hoping to meet up with him [to start a sexual relationship].
>
> …
>
> Q: Okay. And even after you knew that the person maybe was under 18, you continued to talk?
>
> A: Correct.
>
> Q: Why?
>
> A: It was a — it was somebody to talk to. I mean, it was pleasant. It was — like I said, I'm

lonely, you know. Somebody was carrying on a conversation.

…

Q: When you had this conversation, … what did you hope was going to happen?

A: I was hoping this person was 18 or older, like my ad said.

…

Q: Did you ever intend to force or persuade someone under the age of 18 to have sex with you?

A: Not at all.

Q: Did you want to have sex with somebody under the age of 18?

A: Not at all.

Q: What, what was your ultimate goal from all these ad posts that you put up?

A: To be with someone between 18 and 25.

The district court held that Parkhurst's testimony had "opened the door" for the government to question Parkhurst about the emails—particularly those in which he had conversed with purported minors:

> As soon as the defendant began to stress the fact he was looking for ["]of age["] — and he repeated that multiple times in his answers — that certainly began heavily knocking on the door, if not opening it….So, based upon the cumulative nature of both his answers and stressing ["]of

age["] and your question where you pursued what he would do with conversations with people underage, the door has been opened. The government may use the [emails] that I've reviewed … to cross-examine the defendant….I can tell you that when you asked your client — when you headed for that e-mail communication section … you not only opened the door, you basically drove a truck through it….I find that [the emails] are not improperly prejudicial, and they are, in fact, probative so they can be admitted. But, of course, extrinsic evidence is not admissible, so you can cross-examine him about those.

The government then proceeded to cross-examine Parkhurst with the emails, using them to discredit the notion that Parkhurst had only wanted to interact with of-age individuals:

Q: Okay. And so you told Detective Koester that you had never talked to anybody that you believed to be 15?

A: Correct.

…

Q: That's not true, though, is it, Mr. Parkhurst?

A: Well, you really don't know how old anybody is on Craigslist.

Q: The question that Detective Koester asked you is, Did you ever talk to anyone that you

believed was 15 years old on Craigslist, and you said, "No, never."

A: Correct.

Q: Correct? But that is not true. You did talk to people … other than Kacy that you believed were 15 and other minor ages, correct?

A: I wasn't sure of their age.

…

Q: Based on reviewing Government's Exhibit 19D … [d]id you have a conversation with a person that portrayed themselves to be a 15-year-old?

A: Someone that portrayed theirself [*sic.*] as 15, yes.

Q: Okay. And your response when that person asked you if they had to be over 18 was "not if [you] can keep a secret"; is that right?

Defense Attorney: Objection, extrinsic evidence.

District Court: No, this is proper impeachment.

A: Correct.

Q: So, when I asked you earlier if you had a conversation with someone who you believed to be 15, and you said you didn't know what their age was, you certainly knew enough to tell them to keep a secret, correct?

A: Correct.

…

> Q: And [Exhibit 19D] is an e-mail transaction with an individual who identifies himself as Hunter, correct?
>
> A: …. Correct.
>
> Q: And the exhibit that you just reviewed now, I believe, is 19B; is that correct?
>
> A: Correct.
>
> Q: That is a different individual, correct?
>
> A: Correct.
>
> Q: What did you believe his age to be?
>
> A: Well, he said he was 14.

(internal quotation marks added). The government did not move to enter the emails into evidence, and so the district court did not admit them.[9]

Parkhurst asserts that the district court erred by allowing the government to impeach him about his email communications with other individuals purporting to be minors, arguing that they were not in evidence. We review the district court's ruling for an abuse of discretion. *United States v. Kohli*, 847 F.3d 483, 492 (7th Cir. 2017) (citations omitted).

"It is well-settled that when a criminal defendant elects to testify in his own defense, he puts his credibility in issue and

---

[9] After the government's cross-examination, the court concluded that the government's questioning was appropriate: "[A]ll of the exhibits used by the government or the manner in which they impeach was appropriate; they were directed toward the truthfulness of the defendant's statements; and … counsel for the government had a good-faith basis to ask those questions."

exposes himself to cross-examination, including the possibility that his testimony will be impeached." *Id*. (citation omitted). As illustrated above, Parkhurst testified multiple times that he was only interested in interacting with of-age individuals. These repeated assertions put his credibility in issue and thus opened the door for the government to question the truthfulness of his testimony—particularly, by inquiring about his conversations with purported minors. *See id.* Parkhurst's claim that the district court allowed the government to use the emails as extrinsic evidence conflates cross-examination of an issue with use of extrinsic evidence. *See United States v. Sanders*, 614 F.3d 341, 344–45 (7th Cir. 2010) ("[T]he rules of evidence make a distinction between cross-examination as to an issue and the use of extrinsic evidence regarding it."). While "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness[,] … the court may, on cross-examination, allow them *to be inquired into* if they are probative of the character for truthfulness or untruthfulness of … the witness." Fed. R. Evid. 608(b). (emphasis added). The government did not seek to enter the emails to impeach Parkhurst; instead, it cross-examined him about his interactions with purported minors and accepted his answers without contradiction. *Cf. Kohli*, 847 F.3d at 493 (identifying the same distinction regarding the related "collateral evidence rule"); *Simmons, Inc v. Pinkerton's, Inc.*, 762 F.2d 591, 605 (7th Cir. 1985), abrogated on other grounds as recognized by *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 n.12 (7th Cir. 2015) (describing the "collateral evidence rule as "now incorporated into Rule 608(b)"). In sum, the district court correctly found that Parkhurst had opened

the door to his emails and that the government had appropriately impeached him; it was within the court's discretion to admit Parkhurst's testimony given that he had waded into the emails with his eyes open.

### 2. *Prosecutorial Misconduct*

Parkhurst next argues that the government committed prosecutorial misconduct during its closing argument by mentioning a previously-stricken line of testimony regarding another child, Hunter. The government had the following exchange with Parkhurst during cross-examination:

> Q: Now, the individual who identified himself as Hunter in Government's Exhibit 19D, you actually continued and had a text message conversation with him; is that right?
>
> A: Correct.
>
> Q: Would it surprise you to know that Detective Koester found the individual last night?
>
> A: No.
>
> Q: And he was actually 15.
>
> A: Okay.
>
> Defense Attorney: Objection, move to strike, but too late now.
>
> District Court: Well, sustained. The jury will disregard that question and that answer.

Later, during closing arguments, the government reviewed the evidence tailored to Parkhurst's sexually-explicit interactions with Kacy (Detective Koester). Parkhurst's counsel re-

sponded in part by referring to both Parkhurst's testimony regarding his desire to exclusively interact with of-age individuals and his email exchanges with purported adults. During its rebuttal argument, the government highlighted the inconsistencies in Parkhurst's testimony regarding the emails:

> Let's compare what the defendant says to what the evidence shows. He says to Detective Koester, I never talked to anyone who I believed to be 15 years old. But you saw that when I cross-examined him and showed him the e-mails in Government Exhibit 19, that group, *he was talking to a 15-year-old named Hunter*. He was talking to a 14-year-old. He said he was hoping to meet somebody of age, he was not interested in anyone under 18, and only looking for people 18 to 25. But you saw on cross-examination that an experienced 23-year-old, an experienced 20-year-old he rejected. Too much experience. But an experienced 16-year-old, that was fine.

(emphasis added). Parkhurst made no objection.

Parkhurst argues that the government's rebuttal argument relied on the previously-stricken testimony regarding Hunter's real age.[10] "Improper prosecutorial comments during closing arguments are reviewed under a prosecutorial

---

[10] This was problematic, Parkhurst claims, for a variety of reasons: the "Hunter" evidence demonstrated that Parkhurst had a propensity to sexually engage with minors; it was hearsay within hearsay—Hunter's statement to Detective Koester within Detective Koester's statement to the government; and it violated the Confrontation Clause, as Parkhurst was not given the opportunity to confront either Detective Koester or Hunter.

misconduct framework." *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (citation omitted). "This analysis requires, first a determination that prosecutors acted improperly, and second a conclusion that the improper conduct prejudiced the defendant." *Id*. (citation omitted). The government's allusion to Hunter in rebuttal was not improper because it was not in reference to the stricken testimony, as Parkhurst asserts. Rather, the statement was based on Parkhurst's testimony regarding his own email exchanges with Hunter—which, as described above, the government appropriately elicited after Parkhurst had opened the door to impeachment through his email interactions. This testimony about Hunter was separate and apart from the stricken testimony about Hunter's real age.

In any event, Parkhurst cannot show that the government's alleged misconduct prejudiced him. "When gauging prejudice, we consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial." *Id.* at 766 (citation and internal quotation marks omitted). Further, "[w]here the defendant fails to object to the remarks at the time they were made, the plain error standard … requires that the defendant establish not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States*

---

Parkhurst's parade of horribles ends before it begins. Each of these arguments addresses the *admissibility* of the stricken "Hunter" evidence, but it was just that: *stricken* evidence (that was never admitted). The government asked an arguably inappropriate question, Parkhurst answered, his counsel objected, and the district court sustained—possibly for the reasons Parkhurst now lists. None of this is relevant to whether the government's closing arguments—during which no party enters evidence into the record—were improper.

*v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003) (citation and internal quotation marks omitted). Parkhurst cannot meet this standard, given the plethora of unchallenged evidence regarding Parkhurst's interactions with Kacy (Detective Koester). In his email and text messages with Kacy, for example, Parkhurst, upon learning that Kacy was purportedly fifteen years old, responded that Kacy was "only too young if [he could not] keep a secret." Later, in his post-arrest statement to Detective Koester, Parkhurst explained that he had thought Kacy may have been lying about his age but had still assumed he was talking to a fifteen- or sixteen-year-old. Despite that assumption, Parkhurst had then made sexually-explicit offers, asking Kacy whether he was "cut or uncut"; expressing that he "may like to try and suck [Kacy]" and proposing that they "experiment and explore together"; explaining that Parkhurst knew "what to do to prepare [Kacy] so it [would not] hurt"; making clear that Parkhurst "want[ed] both of them to do this over and over"; and, finally, arranging and attempting to pick up Kacy at his Decatur apartment to take him back to Parkhurst's Springfield home. This evidence alone was sufficient to support Parkhurst's conviction. Considering the record as a whole, Parkhurst cannot show that the government's alleged misconduct prejudiced him.

### C. Parkhurst's Sentence

Lastly, Parkhurst argues that the sentencing court erred by enhancing his mandatory-minimum ten-year sentence to eleven years based on the court's finding that he had obstructed the proceeding by asserting his innocence during trial. Parkhurst, however, has waived this challenge, as he only cursorily identifies it in his opening brief, failing to present any legal authority or make any supporting arguments. *See United*

*States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." (quoting *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009))).

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

EASTERBROOK, *Circuit Judge*, concurring. Although I join the majority's opinion, I write separately to observe that the instruction discussed at pages 16–18 is not the best that district courts can do. Parkhurst neither objected to the language quoted at page 17 nor proposed something better, but trial judges should be able to give juries more help than this instruction did.

Detective Koester testified in two capacities: an expert on some issues, he was a lay witness on others. In his expert capacity he helped the jury understand code language used on the Internet to find or attract targets for sexual exploitation; in his other capacity he told the jury about his investigation of and exchanges with Parkhurst.

> [W]hen a witness … testifies in a dual capacity, the district court must take precautions to minimize prejudice to the defendant. The witness's dual role might confuse the jury, or a jury might be smitten by an expert's aura of special reliability and therefore give his factual testimony undue weight. Experts famously possess an aura of special reliability surrounding their testimony. And it is possible that the glow from this halo may extend to an expert witness's fact testimony as well, swaying the jury by virtue of his perceived expertise rather than the logical force of his testimony. Or, the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial. Alternatively, the mixture of fact and expert testimony could, under some circumstances, come close to an expert commenting on the ultimate issue in a criminal matter.

> In light of such dangers, district courts must take some precautions to ensure the jury understands its function in evaluating this evidence. The jury needs to know when an agent is testifying as an expert and when he is testifying as a fact witness. The dual testimony situation places an especially heavy burden on the district court to ensure that the jury understood its function in evaluating the evidence, particularly where the conduct at

> question may appear innocent. To take the necessary precautions, the court can give an appropriate cautionary instruction and require examination of the witness in such a way as to make clear when the witness is testifying to fact and when he is offering his opinion as an expert. Other precautions include the government establishing the proper foundation for the witness's expert opinions and the district court allowing rigorous cross-examination.

*United States v. Christian*, 673 F.3d 702, 712–13 (7th Cir. 2012) (citations and internal quotation marks and other punctuation omitted). By that standard, the instruction given to Parkhurst's jury falls short. It does not tell the jury "when an agent is testifying as an expert and when he is testifying as a fact witness." Nor does it tell the jury not to let the witness's expertise on some matters influence its evaluation of his testimony about the facts of the case.

The district court adapted its language from a precursor to Instruction 3.13 of the *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012 ed.). Instruction 3.13 and its predecessor in the 1999 edition were designed for use with witnesses testifying *solely* as experts. That's why it does not mention the issues that affect dual-capacity witnesses. The Committee on Federal Criminal Jury Instructions could do litigants and district judges a favor by drafting a new instruction for dual-capacity witnesses. Until that happens, litigants and judges should address these issues on their own.

The first step is pinning down exactly which elements of a given witness's testimony reflect expertise and which reflect knowledge gained as a participant in or investigator of a given case. The parties' appellate briefs disagree about which parts of Detective Koester's testimony reflect which of his capacities. They did not try to work out these differences

in the district court through draft instructions or submissions to the district judge, so I appreciate the trial judge's reluctance to address them on his own. Still, the jury needs help, and district judges ought to prompt the parties on the subject.

Language that will warn juries not to let respect for expertise carry over to fact-specific testimony can be drafted for use in all similar cases. Here is a simple possibility: "This witness's special knowledge about [expert subject] does not make his testimony about [lay subject] more reliable than that of any other witness." Perhaps the Committee will come up with an improvement. Particular language is less important than conveying the idea.

Analysis of a legal problem, such as the discussion in *Christian*, can affect the conduct of criminal trials only when lawyers and district judges address the problems and put concrete advice in jury instructions. That was not done in Parkhurst's case because the lawyers did not flag the problem and propose an appropriate treatment. The fact that today's opinion, like *United States v. Moreland*, 703 F.3d 976, 983–84 (7th Cir. 2012), accepts language along the lines of Instruction 3.13 as sufficient does not mean that this instruction *ought* to be given. District judges should do better than the legal floor.

*Moreland* is problematic in its own right. Decided nine months after *Christian*, which it does not cite, *Moreland* told district judges the opposite of *Christian* in some respects. It asserted that distinguishing between lay and expert components of a single witness's testimony is unnecessary and confusing to the jury. 703 F.3d at 983–84. We may need to resolve this intra-circuit conflict in some future case. The panel to-

day sides with *Christian* in identifying dual-capacity testimony as a potential problem on which jurors need information, and with *Moreland* in approving a jury instruction that fails to distinguish the two kinds of testimony. This tension cannot endure indefinitely. The parties to today's appeal have not addressed the tension, let alone asked for its resolution, which can wait for a case in which the subject has been briefed.